RAYMOND J. MAHONEY, *et al.*

*v.*

EUGENE A. WALTER, MARY A. WALTER *and* CECIL WALTER

(No. 13361)

Decided June 11, 1974.

*Patricia H. Valentino* for appellants.

*Schrader, Miller, Stamp & Recht, Arthur M. Recht, Madden & Hughes, G. Charles Hughes* for appellees.

SPROUSE, JUSTICE:

This case is before the Court upon an appeal from the judgment of the Circuit Court of Marshall County in an action instituted by Raymond Mahoney and fifteen other residents and property owners in Mar-Win Place, a community in Marshall County. The plaintiffs sought to permanently enjoin Eugene A. Walter, Mary A. Walter and Cecil Walter, the defendants, from using their property for the purpose of operating a salvage yard. The defendants were permanently enjoined from operating the salvage yard by the Common Pleas Court of Marshall County, and this judgment was affirmed by an order of the Circuit Court of Marshall County. It is from the judgment of the circuit court that the defendants prosecute this appeal.

The evidence is preserved in the record by statements of evidence in lieu of a transcript submitted by both the plaintiffs and the defendants under Rule 80 (e) of the West Virginia Rules of Civil Procedure. The trial court also filed a statement in lieu of a transcript. There is no serious conflict as to what comprised the evidence. The

statements of evidence, however, revealed some conflict between the testimony of various witnesses.

It is apparent from the evidence that Mar-Win Place has been an established community in Marshall County for a number of years and existed as the same type locality for a long time prior to the establishment of the defendants' salvage yard business in 1969. The evidence disclosed that Mar-Win Place is primarily a residential area but was unzoned as to commercial use. Some eight or ten businesses operate in the area including a beauty shop, television repair shop and a tax service. Among the businesses operating in the area, Trenton Construction Company is the largest. It is located on the northernmost edge of the community, but testimony reflected that, because of the topography of the land, the location of the business was neither unsightly nor objectionable. The owner of Trenton Construction Company testified that he had taken great pains to plant trees and foilage to conceal the business from view. The salvage yard was operated primarily as a means of obtaining used parts from wrecked and abandoned automobiles.

The evidence for the plaintiffs revealed the following facts: Approximately one hundred vehicles were stored at random upon the defendants' property. No precaution was taken to drain the vehicles of gasoline or other flammable materials; nor was precaution taken by the defendants to prevent entrance to the yard itself or to the trunks, hoods or interiors of the stored vehicles. A wooden fence had been erected across the front of the property, but no fence had been erected to the sides or rear of the storage area.

The salvage yard is located within a minimum distance of thirty feet to a maximum distance of three hundred feet from adjoining property owners. The yard is open for business six days a week from eight o'clock a.m. to five o'clock p.m. Work was occasionally performed in the yard on Sundays. A four-inch high pressure natural gas line traverses the entire width of the property. A number of

wrecked and abandoned vehicles are stacked over the line, undrained of gasoline and other flammable materials. Several of the plaintiffs and their witnesses expressed fear that this situation presented a potential fire hazard.

According to some of the plaintiffs' witnesses a number of rats and snakes had been seen in the vicinity of the salvage yard. Others testified that there were a number of children in the area, and several of the witnesses had observed them playing in or near the salvage yard.

A witness for the plaintiff testified that the noise of the wreckers disturbed her and that she had heard cars being moved in the junk yard between ten and eleven o'clock p.m. Another indicated she was disturbed by the unsightly growth of high weeds in the salvage yard.

Six of the plaintiffs testified that their property values had diminished since the commencement of the operation of the salvage yard. A real estate appraiser in the area stated that he believed that the location of the salvage yard was a deteriorating factor in the value of the Mar-Win property. One plaintiff testified that she had planned to do extensive remodeling to her home but would not do so now because of the salvage yard. Other witnesses for the plaintiff testified that the salvage yard was unsightly, that it disturbed the natural and physical beauty of the neighborhood, and that it presented a threat to the health and safety of the residents of Mar-Win Place.

The principal defense witness, Cecil Walter, testified that the salvage yard could be suitably fenced to prevent entrance of children and to make it more attractive. No action in this respect has been taken by the defendants. Walter stated that he had operated salvage yards for a number of years and had never experienced a fire. He admitted a certain amount of noise was attached to the business of pressing and baling the wrecked cars and abandoned vehicles.

Two residents of Mar-Win testified for the defendants. Neither felt the neighborhood was exclusively residential.

One of the witnesses attributed depreciating property values to the presence of Trenton Construction Company, although from her testimony it was evident that the value of her property had appreciated since its purchase in 1956. The other defense witness testified that he did not believe the presence of the salvage yard would depreciate property values. According to these witnesses, the presence of rats was due to high waters along Wheeling Creek.

During the trial of this proceeding, the trial court visited the salvage yard and the surrounding Mar-Win area. Based upon the evidence adduced and the view taken, the trial court made and entered specific findings of fact. Inasmuch as its findings do not differ essentially from those recited herein as the plaintiffs' evidence, it is not necessary to restate them.

The trial court concluded that the location of the salvage yard is a threat to the health of the residents; that it destroys the natural beauty of the area; that it tends to destroy the residential quality of the area, causing a depreciation of property values; that it causes stress to the residents of the area and interferes with their comfort and enjoyment; that its presence has a deleterious effect on the neighborhood; and that all of this constituted a nuisance which he permanently enjoined.

The plaintiffs contend preliminarily that this appeal should not be considered by this Court because of the defendant's lack of procedural compliance in perfecting their appeal to the circuit court. In support of this contention, they maintain that the following procedural omissions precluded the circuit court from hearing the appeal under the provisions of Code, 1931, 58-4-15, and required its dismissal by reason of Code, 1931, 58-4-14: (1) no process or summons was issued on the appeal by the circuit court as required by Code, 1931, 58-4-11; and (2) no endorsement on the summons or certified court order, as required by Code, 1931, 58-4-12, noting that bond requirements had been met, was made by the clerk. Since the alleged

procedural omissions are not documented in the record, we cannot consider this objection.

The plaintiffs, also contend that this appeal should not be heard because of the defendants' failure to assign substantive grounds of error in the motion for a new trial, the only error assigned being the loss of the original stenographic transcript. The plaintiffs argue that the failure to assign substantive grounds of error constituted a waiver of all error occurring during the trial under Rule 59 (f) of the West Virginia Rules of Civil Procedure.

Rule 59 (f), R.C.P., is as follows: "(f) *Effect of failure to move for new trial*—If a party fails to make a timely motion for a new trial, after a trial by jury wherein a verdict is returned without a direction thereof by the court, the party is deemed to have waived all errors occurring during the trial which he might have assigned as grounds in support of such motion; * * *"

This rule, by clear and unequivocal language, limits its application to motions for a new trial made after a trial by jury. Since this action was tried by the court without a jury, Rule 59 (f) has no application. See LUGAR AND SILVERSTEIN, West Virginia Rules 458, wherein it is said, "Furthermore, the Rule applies only 'after a trial by jury wherein a verdict is returned without direction thereof by the court.' " See also *Breedlove v. Galloway,* 109 W.Va. 164, 153 S.E. 298, wherein this Court analyzed the rationale which underlies the exclusion of purely court actions from the operation of Rule 59 (f).

We find no merit in defendants' contention that the trial court committed error in refusing to grant a new trial due to the absence of a transcript of the original proceedings. The court reporter lost the stenographic notes before they could be transcribed. Both parties availed themselves of the opportunity afforded by Rule 80 (e) of the West Virginia Rules of Civil Procedure and submitted statements of evidence in lieu of transcript. Neither party objected to the submitted statements. Rule

80 (e) provides for such objection. The common pleas court certified the record pursuant to Rule 80 (e), and we perceive no error in these procedures. The defendants failed to raise this issue either in the common pleas court or the Circuit Court of Marshall County and, if for no other reason, would be precluded from raising the issue on this appeal. *Pettry v. The Chesapeake and Ohio Railway Company,* 148 W.Va. 443, 135 S.E.2d 729.

The sole issue, therefore, on this appeal is whether the trial court abused its discretion in finding the presence of the salvage yard in the Mar-Win community constituted a nuisance which should be completely enjoined.

It is well-settled law that the power to grant or deny injunctive relief against a nuisance as well as the scope of the injunction rest within the sound discretion of the trial court, according to the facts and circumstances of the particular case. The trial court's action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion. *Stuart v. Lake Washington Realty Corporation,* 141 W.Va. 627, 92 S.E.2d 891.

Text writers and courts have found it difficult to formulate a comprehensive definition of nuisance. "The term 'nuisance' is incapable of an exact and exhaustive definition which will fit all cases, because the controlling facts are seldom alike, and because of the wide range of subject matter embraced under the term. There is no exact rule or formula by which the existence of a nuisance may be determined, but each case must stand on its own facts and special circumstances." 58 AM. JUR. 2d, *Nuisances,* Section 1, pages 553-54.

Through the years the process of legal metamorphosis has had little effect on the basic concept of a legally objectionable nuisance; rather changes in the law have been confined primarily to adapting original concepts to changing patterns in family and industrial life.

The basic concept of a private nuisance has been expressed simply, as Blacktone's definition "anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another." 3 BLACKSTONE, COMMENTARIES 216. It has since been expressed variously as fits the exigency of particular cases.

We need look no further for guidance, however, than the 1956 decision of this Court which treated exhaustively the subject of private nuisances. This Court said, after reviewing different specific acts which had been held to be private nuisances in West Virginia, "* * * A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable. * * * A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort. * * * A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby. * * * When the prosecution of a business, of itself lawful, in a strictly residential district, impairs the enjoyment of homes in the neighborhood, and infringes upon the well-being, comfort, repose, and enjoyment of the ordinary normal individual residing therein, the carrying on of such business in such locality becomes a nuisance, and may be enjoined. * * *" *Martin v. Williams,* 141 W.Va. 595, 610, 93 S.E.2d 835, 839.

The Court, in *Martin,* also said, "The question of whether there exist a nuisance per accidens, or a nuisance in fact, is, by its very definition, dependent upon the proof adduced before the trial chancellor. The well established rule, that the findings of a trial court will not ordinarily be disturbed upon appeal, applies to the findings of the chancellor. A finding of fact from conflicting depositions is entitled to peculiar weight, and will not be disturbed by this Court unless it is manifestly wrong. * * *" *Martin v. Williams, supra* at 612, 93 S.E.2d at 845.

The appellant contends that the doctrine of the "balancing of conveniences" should be applied—that is, that

when the injury to the defendant in losing its business location is so much greater than the inconvenience to the owners of nearby property, the permanent injunction should be denied or, at the very least, the injunction order should be tailored to permit the continued operation of the salvage yard with appropriate steps being taken to reduce the objectionable features. Considering the relative hardship imposed upon the parties either by granting or denying an injunction is a doctrine that has been in American law for some time. *Restatement of Torts*, Injunctions, Section 941. However, the balancing of convenience—the disparity of economic consequences is a comparatively new development. 22 Case W. L. Rev. 356; 43 Colo. L. Rev. 225. Under this doctrine, economic consequence to the business owner and the public is compared to the damage to the adjacent property owners who may be compensated by action and damage. The damage to the business owner is normally the loss of investment, loss of profit and the like. The damage to the public is the loss of economic stimuli such as loss of employment.

. One of the chief problems with this doctrine is that it compares the general loss to the public, such as loss of jobs, while it only considers specific loss to the private land owner, *i.e.*, the specific money damage to his property, notwithstanding he may be damaged in many general ways which cannot be translated into specific damages. Regardless of the judicial soundness of the doctrine of '"balancing conveniences", there was no evidence in this case of a general public economic interest. The only economic interest to be balanced was the private economic interest of the business owner, that is, the loss of this specific locality where he could conduct his business. Admitting this can be, and probably is considerable, Mar-Win Place is not the only locality wherein this type of business can be conducted. The mobility of a business, that is, its adaptability to being conducted in various places rather than in one specific locality is one of the factors to be considered. *Sanders v. Roselawn Memorial*

*Gardens,* 152 W.Va. 91, 159 S.E.2d 784; *Parkersburg Builders Material Company v. Barrack,* 118 W.Va. 608, 191 S.E. 368.

Modern cases litigating alleged nuisances frequently involve the resolution of conflicting interests between business and private residences. This case falls within that pattern.

> "The operation of a legitimate business or industrial plant which constitutes a private nuisance may be enjoined, where it clearly appears that there is no other complete remedy for the injury done. But this should never be done if it is possible to avoid it while still giving the plaintiff the relief to which he is entitled. * * * If the business or plant can be so conducted as not to constitute a nuisance, the injunction should be limited to prohibiting the acts complained of which constitute the nuisance, leaving the defendant free to operate it in a proper manner * * *.

> "* * * In determining whether a lawful business should be abated as a nuisance the rights of habitation in residential districts are ordinarily superior to the rights of trade or business therein, particularly where the business is nonessential and not dependent upon a fixed location. * * *"
> 58 Am. Jur. 2d, *Nuisances,* Section 178, pages 771-73.

This text also abstracts the general rules by which the character of a locality may be determined as residential, business or industrial, and how the effect of a nuisance may be weighed. Businesses and occupations which, if performed or conducted elsewhere would not be nuisances, may be declared a nuisance if performed or conducted in residential areas.

> "* * * It has been said that in determining the existence of a nuisance in a purely residential area, very strict rules are enforced and only slight interference with residential rights is tolerated. * * *

> "According to some authorities, the rights of habitation are superior to the rights of trade, and

whenever they conflict, the rights of trade must yield to the primary or natural rights. Where this rule obtains, if a lawful business is conducted in such a manner as to interfere materially with the physical comfort of persons of ordinary sensibilities and habits, who live nearby, an injunction should be granted, permanently restraining its operation in such manner.

\* \* \*

"What constitutes a residential district which affords a basis for relief against the establishment of an obnoxious business which constitutes a nuisance cannot be precisely defined, but should be determined from the surrounding facts and circumstances. A court will not interfere with the continuance of a lawful business in a locality where the buildings are mainly occupied for business purposes because a few families may reside in the neighborhood. On the other hand, it is no defense to an action to enjoin an alleged nuisance that the residential area affected is very small." 58 AM. JUR. 2d, *Nuisances,* Section 38, pages 603-05.

However, it is possible that the character of a locality or neighborhood can be altered by business actions carried on by local traditions. "In business and industrial districts the rights of residents have become modified to some extent by the use to which such districts are put." 58 AM. JUR. 2d, *Nuisances*, Section 39, page 605.

It is clear that the type of locality has an important bearing on a reasonable use of a business property. See *Sanders v. Roselawn Memorial Gardens,* 152 W.Va. 91, 113, 159 S.E.2d 784, 798, wherein this Court said, "They are in a rural area as distinguished from an urban or residential area. 'In general, a fair test as to whether a business lawful in itself, or a particular use of the property, constitutes a nuisance is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case; and ordinarily, where the use made of the property

or the conduct of the business is reasonable, no actionable nuisance is created as against which relief may be had. * * *' 66 C.J.S., Nuisances, Section 8c, page 744."

This Court has previously applied law of nuisance to various phases of the automotive business. *Martin v. Williams, supra; Parkersburg Builders Material Company v. Barrack,* 118 W.Va. 608, 191 S.E. 368. We have said:

> "An automobile junk yard is not necessarily an objectionable place. The business of buying old automobiles, wrecking them and selling serviceable parts as such and junking the residue is an honorable and useful business. But an outdoor lay-out of a business of that kind necessarily is not pleasing to the view. Such business, therefore, should not be located in a community of unquestioned residential character.

> "Where, however, a section of a municipality is not a clearly established residential community a court of equity will not be warranted in excluding therefrom as a nuisance an automobile-wrecking business merely on the ground of unsightliness." *Parkersburg Builders Material Company v. Barrack, supra* at 613, 191 S.E. at 371.

The trial court in this proceeding was presented two basic considerations: (1) Did a nuisance exist; and (2) was it of such a nature as to require its complete abatement by a total permanent injunction. In arriving at its first conclusion, the court could properly consider the nature of the businesses; the type of locality in which the business is located; and the type of activities complained of.

While some testimony was conflicting, there was ample evidence upon which the court could conclude that Mar-Win Place was basically a residential area with some unoffensive businesses. There is likewise evidence to sustain the court's finding that the area, in the immediate vicinity of the salvage yard, was exclusively residential. Facts concerning the activities complained of have been recited. The unsightliness of the yard itself, the noise

necessitated by the preparing of the junked automobiles for removal, the possible danger of flammable materials, the possible danger to children from the unprotected nature of the area, and the prevalence of rodents and insects justified the trial court in finding that a nuisance existed regardless of whether the area was exclusively or primarily residential.

The defendants moved that the trial court grant a modified injunction abating the nuisance by permitting them to remedy objectionable features. The trial court overruled that motion and there is ample evidence to sustain this decision that the nuisance could not be abated in this manner.

Although it was not mentioned in the trial court's memorandum opinion, it must be assumed that it considered the effect on the defendants' business and the economic effect on his private affairs and compared them to the present and prospective harm to the defendants in the event the injunction was denied.

Viewing the record as a whole, it is abundantly clear that the trial court had more than sufficient evidence upon which to make a finding that Mar-Win Place was a residential area; that the defendants were conducting their business in the residential area in such a manner as to constitute a nuisance; and that the nuisance could not be abated by anything short of an injunction requiring its removal. The court, having sufficient evidence on which to base its decision of fact and conclusions of law, it cannot be said to have abused its discretion.

In view of the above, the decision of the Circuit Court of Marshall County is affirmed.

*Affirmed.*